1   JOHN ALLCOCK (Bar No. 098895)
    RANDALL E. KAY (Bar No. 149369)
2   ERICA PASCAL (Bar No. 248677)
    DLA PIPER US LLP
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel:  619.699.2800
    Fax:  619.699.2701
5   john.allcock@dlapiper.com
    randy.kay@dlapiper.com
6
    [*Additional attorneys listed on following page*]
7

8   Attorneys for Defendants/Counterclaimants
    NEXTEL COMMUNICATIONS, INC., et al.
9

10                  UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12

13   ENOVSYS LLC, a California limited       CASE NO.  CV 06-5306-RSWL (SHx)
     liability company,
14                                           **NEXTEL OF CALIFORNIA, INC.,
                 Plaintiff,                   ET AL.'S MEMORANDUM OF
15                                            POINTS AND AUTHORITIES IN
            v.                                SUPPORT OF MOTION FOR
16                                            SUMMARY JUDGMENT OF
     NEXTEL COMMUNICATIONS,                   INVALIDITY UNDER 35 U.S.C.
17   INC., et al.,                            §§ 102 AND 103**

18               Defendants.

19   NEXTEL COMMUNICATIONS,                   Date:          February 14, 2008
     INC., et al.,                            Time:          9:00 a.m.
20                                            Courtroom:     21
                 Counterclaimants,
21                                            Judge:      Hon. Ronald S.W. Lew
            v.                                Discovery Cutoff:  November 26, 2007
22                                            Pretrial Conf.:    April 7, 2008
     ENOVSYS LLC, a California limited        Trial:             May 6, 2008
23   liability company,

24               Counterdefendant.

25

26

27

28

RAYMOND W. MORT III
(admitted pro hac vice, TX Bar No. 00791308)
DLA PIPER US LLP
1221 South MoPac Expressway, Suite 400
Austin, TX 78746
Tel:  (512) 457-7234
Fax:  (512) 457-7001
raymond.mort@dlapiper.com

JOSHUA BRIONES (Bar No. 205293)
DLA PIPER US LLP
1999 Avenue of the Stars, Fourth Floor
Los Angeles, CA  90067-6022
Tel:  (310) 595-3076
Fax:  (310) 595-3376
joshua.briones@dlapiper.com


Attorneys for Defendants/Counterclaimants
NEXTEL COMMUNICATIONS, INC., et al.

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................... 1

II.    BACKGROUND ..................................................................... 2

III.   ANTICIPATION AND OBVIOUSNESS COMPEL SUMMARY
       JUDGMENT OF INVALIDITY OF BOTH PATENTS-IN-SUIT ............... 2

       A.    Anticipation and Obviousness Are Questions of Law ......................... 3

       B.    The Claimed Subject Matter of a Patent as a Whole Is Reduced
             to the Distinguishing Features Clearly Incorporated Into the
             Claims ................................................................................... 4

       C.    The Existence of Differences Between Claimed Subject Matter
             and Prior Art Does Not Defeat Obviousness ................................... 4

       D.    Obviousness Is a Common Sense Matter ...................................... 6

       E.    Predictable Variations and Solutions Are Obvious ............................ 6

       F.    Applying Common Sense and Known Techniques Is Obvious ........... 7

       G.    Enovsys Is Estopped From Denying That Prior Art Systems
             That Otherwise Would Be Accused of Infringing Invalidate the
             Patents-in-Suit ...................................................................... 8

IV.    THE NAMED INVENTORS' ACKNOWLEDGEMENT OF PRIOR
       ART TECHNIQUES AND SYSTEMS RENDERS THE PATENTS
       INVALID ................................................................................. 8

       A.    It Was Known in the Art to Track the Location of Pagers .................. 8

       B.    It Was Obvious to Provide Privacy to Protect Subscribers ................. 8

       C.    It Was Known for Telephone Networks to Provide Privacy and
             Access Controls to Subscriber Services ....................................... 9

       D.    A Person of Ordinary Skill in the Art Knew How to Change
             Passwords .............................................................................. 9

       E.    The Scope of the Claims Is Reduced to the Inventor's Claims
             Regarding the Fundamental Difference Between Patents and
             Prior Art ................................................................................ 10

V.     SPECIFIC INVALIDATING PRIOR ART REFERENCES ...................... 11

/////

/////

# TABLE OF CONTENTS
### (continued)

Page

A.   U.S. Patent No. 5,946,626 to Foladare et al. ("Foladare")–A Method and System for Determining Location of Subscriber of Two-Way Paging Service ................................................................ 11

    1.   Foladare Discloses the "Distinguishing Features" of the Patents-In-Suit ....................................................................... 12

        a.   Foladare Discloses "Continuous Tracking" When a "Preauthorized" Network Resource Is Being Denied Access ................................................................ 13

        b.   Under the Holding in Graham v. John Deere, Foladare Invalidates the Patents-in-Suit........................ 14

    2.   Foladare Discloses All Claimed Limitations in the Patents-in-Suit.................................................................... 14

        a.   Foladare Describes "a Satellite Paging Communications System With Means to Locate the Global Position [of a] Call Receiver Unit." ................... 14

        b.   Foladare Discloses "a Call Receiver With the Ability to Resolving Its Location and Establishing the Location Information at the Network," and "a Mobile Remote Unit," and "Mobile Remote Receiving Unit." ............................................................ 16

        c.   Foladare Discloses "a Mobile Unit Able That Is Able to Establish Its Location Information at the Network." ...................................................................... 16

        d.   Foladare Discloses "a First Profile" and "a Second Profile" and the "Use [of] the Identity of a Preauthorized Resource to Deny Access to Location Information."................................................... 17

        e.   Foladare Discloses Allowing Certain "Preauthorized" Resources Access to Location Information While Blocking Other "Preauthorized" Resources Access to This Information........................... 19

B.   Foladare Suggests Alternative Design Based on Prior Art Knowledge and Techniques.............................................................. 21

/////

-ii-

SD\1778098.1

DLA PIPER US LLP
SAN DIEGO

CASE NO.  CV 06-5306-RSWL (SHX)

1

## TABLE OF CONTENTS
### (continued)

2

Page

3   VI.   THE CLAIMED SUBJECT MATTER IS A CHOICE FROM A
4         FINITE NUMBER OF IDENTIFIED, PREDICTABLE SOLUTIONS
          TO A PROBLEM, WITH A REASONABLE EXPECTATION OF
5         SUCCESS ................................................................................................ 23

6   VII.  THE CLAIMED SUBJECT MATTER IS AN APPLICATION OF A
7         KNOWN TECHNIQUE TO A KNOWN SYSTEM READY FOR
          IMPROVEMENT TO YIELD PREDICTABLE RESULTS ........................ 24

8   VIII. THE CLAIMED SUBJECT MATTER IS A PREDICTABLE
9         VARIATION OF A KNOWN WORK THAT WOULD HAVE BEEN
          PROMOTED BASED UPON DESIGN INCENTIVES .............................. 24
10
    IX.   CONCLUSION ............................................................................................ 25
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### CASES

4

*Celotex Corp. v. Catrett*,
5
        477 U.S. 317 (1986) ............................................................................ 3

6

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
7
        480 F.3d 1335 (Fed. Cir. 2007) ........................................................... 8

8

*Dann v. Johnston*,
9
        425 U.S. 219, 189 USPQ 257 (1976) .................................................. 4

10

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
11
        535 U.S. 722 (2002) ............................................................................ 8

12

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
13
        344 F.3d 1359 (Fed. Cir. 2003) ........................................................... 8

14

*Graham v. John Deere Co.*,
15
        383 U.S. 1, 148 USPQ 459 (1966)............................3, 4, 5, 6, 10, 11, 12, 14

16

*KSR Int'l Co. v. Teleflex Inc.*,
17
        127 S. Ct. 1727, 82 USPQ2d 1385 (2007).......................................... 3, 5, 6, 7

18

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
19
        485 F.3d 1157, 82 USPQ2d 1687 (Fed. Cir. 2007) ............................. 7

20

*Minton v. National Ass'n. of Securities Dealers, Inc.*,
21
        336 F.3d 1373 (Fed. Cir. 2003)........................................................... 3

22

### STATUTES

23

24
35 U.S.C. § 102........................................................................................ 1, 2, 12, 25

25
35 U.S.C. § 103........................................................................................ 1, 2, 3, 5, 25

26
35 U.S.C. § 112........................................................................................ 8

27

28
Federal Rule of Civil Procedure 56 ........................................................ 2

DLA PIPER US LLP
SAN DIEGO
SD\1778098.1

CASE NO.  CV 06-5306-RSWL (SHX)

1   **I.      INTRODUCTION**

2          Defendants Nextel of California, Inc. et al. ("Nextel") move for summary

3   judgment on invalidity of United States Patent Nos. 5,918,159 (the "'159 Patent")

4   and 6,650,461 (the "'461 Patent") (collectively, the "patents-in-suit") because the

5   two patents fail to meet the conditions of patentability under 35 U.S.C. §§ 102 and

6   103.  Specifically, the claimed inventions are anticipated by prior art systems and

7   references (the § 102 defense) and the claimed subject matter as a whole was

8   obvious to a person having ordinary skill in the art at the time the purported

9   invention was made (the § 103 defense).

10         In short, summary judgment on invalidity grounds is proper because:

11         •      U.S. Patent No. 5,946,626 to Foladare, et al. ("Foladare") discloses all

12   claim limitations for both patents-in-suit.  Because Foladare was filed prior to the

13   filing of the patents-in-suit, Foladare anticipates all claims in the patents-in-suit.

14         •      Patent law holds that when a patent was only obtained by accepting

15   limitations imposed by the Examiner, the claimed subject matter as a whole is

16   reduced to these distinguishing limitations clearly incorporated into the claims;

17         •      The Applicants reduced the scope of the '461 patent claims through

18   amendments that accepted limitations imposed by the Examiner, while systems with

19   the elements accused of infringing predate the patents-in-suit by years;

20         •      The claimed subject matter is a choice from a finite number of

21   identified, predictable solutions to a problem, with a reasonable expectation of

22   success;

23         •      The claimed subject matter in the patents-in-suit is an application of a

24   known technique to a known system ready for improvement to yield predictable

25   results; and

26         •      The claimed subject matter is a predictable variation of known work

27   that would have been promoted based upon design incentives.

28   /////

1

1      Accordingly, Nextel requests judgment under Federal Rule of Civil

2  Procedure 56 that the patents-in-suit are invalid in their entirety because the known

3  prior art establishes as a matter of law that the '159 patent and the '461 patent fail to

4  satisfy the conditions of patentability under 35 U.S.C. §§ 102 and 103.  Because

5  Enovsys' repeated assertions of infringement by Nextel identify known prior art

6  systems, the Court can dispose of this issue without deciding any claim construction

7  issues.

8  **II.  BACKGROUND**

9      The essence of the system claimed by the two patents-in-suit is a paging

10  system that tracks the location of the subscriber in order to efficiently route pages to

11  the precise area of the subscriber.  As a result of having the current location of the

12  subscriber, the system is able to provide a location reporting service in which a caller

13  sending a page can obtain the location of the subscriber being paged.  (SUF 1.)  This

14  location reporting feature is optional by virtue of whether the subscriber activates the

15  "position disclosure feature" for the account.  When the feature is active, privacy of

16  the subscriber's location is provided by requiring a caller requesting the location to

17  provide the current "Special Code" (e.g., PIN code), for the pager.  In other

18  instances, when the feature is not active, the paging system will not provide the

19  subscriber's location to callers.

20      The paging system claimed in the two patents-in-suit fails to meet the

21  conditions of patentability.  Prior art such as the Foladare patent (filed December 26,

22  1995) renders the patents invalid.  The obviousness of the claimed inventions –

23  under the 2007 standard pronounced by the Supreme Court – also invalidates the

24  patents-in-suit.

25  **III.  ANTICIPATION AND OBVIOUSNESS COMPEL SUMMARY**

26      **JUDGMENT OF INVALIDITY OF BOTH PATENTS-IN-SUIT.**

27      Under Federal Rule of Civil Procedure 56, summary judgment is proper

28  when "there is no genuine issue as to any material fact" and "the moving party is

2

1   entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

2   (1986).  Summary judgment on the issue of invalidity is entirely appropriate in

3   patent case.  *Minton v. National Ass'n. of Securities Dealers, Inc.* 336 F.3d 1373,

4   1381 (Fed. Cir. 2003) (affirming summary judgment on invalidity under

5   Section 102).

6           **A.      Anticipation and Obviousness Are Questions of Law.**

7           A prior art reference that discloses each and every element of a patent claim

8   "anticipates" as a matter of law.  Anticipation renders a patent invalid.  *Minton v.*

9   *National Ass'n. of Securities Dealers, Inc.* 336 F.3d 1373, 1381 (Fed. Cir. 2003).

10          The Supreme Court recently clarified the expansive scope of obviousness as

11  a bar to patentability.  "Section 103 forbids issuance of a patent when 'the

12  differences between the subject matter sought to be patented and the prior art are

13  such that the subject matter as a whole would have been obvious at the time the

14  invention was made to a person having ordinary skill in the art to which said subject

15  matter pertains.'"  *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734, 82 USPQ2d

16  1385, 1391 (2007).  The question of obviousness is a question of law resolved on the

17  basis of underlying factual determinations including (1) the scope and content of the

18  prior art, (2) any differences between the claimed subject matter and the prior art,

19  and (3) the level of skill in the art.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18,

20  148 USPQ 459, 467 (1966).  *See also KSR*, 127 S. Ct. at 1734, 82 USPQ2d at 1391

21  ("While the sequence of these questions might be reordered in any particular case,

22  the [*Graham*] factors continue to define the inquiry that controls.").  "If a court, or

23  patent examiner, conducts this analysis and concludes the claimed subject matter

24  was obvious, the claim is invalid under § 103."  *KSR*, 127 S. Ct. at 1734,

25  82 USPQ2d at 1391.

26  /////

27  /////

28  /////

3

**B.**     **The Claimed Subject Matter of a Patent as a Whole Is Reduced to the Distinguishing Features Clearly Incorporated Into the Claims.**

"It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office." *Graham*, 383 U.S. at 33, 148 USPQ at 473.  Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. *Id.*

When "the patentee obtained his patent only by accepting the limitations imposed by the Examiner" and "[t]he claims were carefully drafted to reflect these limitations," the patentee "is not now free to assert a broader view of [] [the] invention." *Id.*  "The subject matter as a whole reduces, then, to the distinguishing features clearly incorporated into the claims." *Id.*

**C.**     **The Existence of Differences Between Claimed Subject Matter and Prior Art Does Not Defeat Obviousness.**

The mere existence of differences between the prior art and the claim does not establish nonobviousness. *Dann v. Johnston*, 425 U.S. 219, 230, 189 USPQ 257, 261 (1976).  The issue is "whether the difference between the prior art and the subject matter in question 'is a difference sufficient to render the claimed subject matter unobvious to one skilled in the applicable art.'" *Dann*, 425 U.S. at 228-29, 189 USPQ at 261 (citation omitted) (finding system for automatic record keeping of bank checks and deposits obvious in view of nature of extensive use of data processing systems in banking industry and "closely analogous" patent for an automatic data processing system used in a large business organization for keeping and updating system transaction files for each department of the organization).  To be nonobvious, an improvement must be "more than the predictable use of prior art

/////

4

1   elements according to their established functions." *KSR*, 127 S. Ct. at 1740,

2   82 USPQ2d at 1396.

3         In *KSR*, the Supreme Court emphasized "the need for caution in granting a

4   patent based on the combination of elements found in the prior art," *id.* at 1739,

5   82 USPQ2d at 1395.  In particular, the Supreme Court emphasized that "the

6   principles laid down in *Graham* reaffirmed the 'functional approach' of *Hotchkiss*,

7   11 How. 248 [(1850)]." *KSR*, 127 S. Ct. at 1739, 82 USPQ2d at 1395 (citing

8   *Graham v. John Deere Co.*, 383 U.S. 1, 12, 148 USPQ 459, 464 (1966) (emphasis

9   added)), and reaffirmed principles based on its precedent that "[t]he combination of

10   familiar elements according to known methods is likely to be obvious when it does

11   no more than yield predictable results." *Id.*  The Court explained:

12         When a work is available in one field of endeavor, design incentives and

13         other market forces can prompt variations of it, either in the same field or a

14         different one.  If a person of ordinary skill can implement a predictable

15         variation, § 103 likely bars its patentability.  For the same reason, if a

16         technique has been used to improve one device, and a person of ordinary skill

17         in the art would recognize that it would improve similar devices in the same

18         way, using the technique is obvious unless its actual application is beyond his

19         or her skill.

20   *Id.* at 1740, 82 USPQ2d at 1396.  The operative question in this "functional

21   approach" is thus "whether the improvement is more than the predictable use of

22   prior art elements according to their established functions." *Id.* at 1740, 82 USPQ2d

23   at 1396.  The Court explained that:

24         [o]ften, it will be necessary . . . to look to interrelated teachings of multiple

25         patents; the effects of demands known to the design community or present in

26         the marketplace; and the background knowledge possessed by a person

27         having ordinary skill in the art, all in order to determine whether there was an

28   */////*

1   apparent reason to combine the known elements in the fashion claimed by the

2   patent at issue.

3   *Id.* at 1740-41, 82 USPQ2d at 1396.

4       **D.    Obviousness Is a Common Sense Matter.**

5       "A person of ordinary skill is also a person of ordinary creativity, not an

6   automaton." *Id.* at 1742, 82 USPQ2d at 1397.  "Common sense teaches . . . that

7   familiar items may have obvious uses beyond their primary purposes, and in many

8   cases a person of ordinary skill will be able to fit the teachings of multiple patents

9   together like pieces of a puzzle." *Id.*

10      "[T]he analysis need not seek out precise teachings directed to the specific

11  subject matter of the challenged claim, for a court can take account of the inferences

12  and creative steps that a person of ordinary skill in the art would employ." *Id.* at

13  1740-41, 82 USPQ2d at 1396.

14      "In many fields it may be that there is little discussion of obvious techniques

15  or combinations, and it often may be the case that market demand, rather than

16  scientific literature, will drive design trends." *KSR*, 127 S. Ct. at 1741, 82 USPQ2d

17  at 1396.  "Under the correct analysis, any need or problem known in the field of

18  endeavor at the time of invention and addressed by the patent can provide a reason

19  for combining the elements in the manner claimed." *Id.* at 1741, 82 USPQ2d at

20  1397.

21      **E.    Predictable Variations and Solutions Are Obvious.**

22      In *KSR*, The Supreme Court explained "[w]hen there is a design need or

23  market pressure to solve a problem and there are a finite number of identified,

24  predictable solutions, a person of ordinary skill has good reason to pursue the known

25  options within his or her technical grasp." *KSR*, 127 S. Ct. at 1742, 82 USPQ2d at

26  1397.  "If this leads to the anticipated success, it is likely the product not of

27  innovation but of ordinary skill and common sense," *id.* and, in such an instance "the

28  /////

6

1  fact that a combination was obvious to try might show that it was obvious under
2  § 103." *Id.*

3       **F.    Applying Common Sense and Known Techniques Is Obvious.**

4       The Federal Circuit recently concluded that it would have been obvious to
5  combine (1) a device for actuating a phonograph to play back sounds associated with
6  a letter in a word on a puzzle piece with (2) a processor-driven device capable of
7  playing the sound associated with a first letter of a word in a book. *Leapfrog*
8  *Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161, 82 USPQ2d 1687, 1690-91
9  (Fed. Cir. 2007).  In reaching that conclusion, the Federal Circuit recognized that
10  "[a]n obviousness determine is not the result of a rigid formula disassociated from
11  the consideration of the facts of a case.  Indeed, the common sense of those skilled in
12  the art demonstrates why some combinations would have been obvious where others
13  would not." *Id.* at 1161, 82 USPQ2d at 1687 (citing *KSR*, 127 S. Ct. 1727, 1739,
14  82 USPQ2d 1385, 1395 (2007)).

15       Although the combination of prior art references lacked a "reader" to
16  automatically identify the book inserted in the device, the Federal Circuit found no
17  error in the District Court's determination that readers were well known in the art at
18  the time of the invention.  *Id.* at 1162, 82 USPQ2d at 1691.  In addition, the Court
19  found that the reasons for adding a reader to the combination of prior art references
20  "are the same as those for using readers in other children's toys-namely, providing
21  an added benefit and simplified use of the toy for the child in order to increase its
22  marketability." *Id.* at 1162, 82 USPQ2d at 1692.  The Federal Circuit relied in part
23  on the fact that Leapfrog had presented no evidence that the inclusion of a reader in
24  the combined device was "uniquely challenging or difficult for one of ordinary skill
25  in the art" or "represented an unobvious step over the prior art." *Id.* (citing *KSR*, 127
26  S. Ct. at 1740-41, 82 USPQ2d at 1396).

27  /////
28  /////

7

**G.      Enovsys Is Estopped From Denying That Prior Art Systems That Otherwise Would Be Accused of Infringing Invalidate the Patents-in-Suit.**

Prosecution history estoppel "prevents a patentee from recapturing under the doctrine of equivalents subject matter surrendered during prosecution to obtain a patent." *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1341 (Fed. Cir. 2007).  Put another way, there is a rebuttable presumption that "[a] patentee who narrows a claim as a condition for obtaining a patent disavows his claims to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 737 (2002).  Whether a patentee can overcome the rebuttable presumption that equivalents to a narrowed claim limitation were surrendered is a question of law.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1367-68 (Fed. Cir. 2003) (*en banc*).

**IV.    THE NAMED INVENTORS' ACKNOWLEDGEMENT OF PRIOR ART TECHNIQUES AND SYSTEMS RENDERS THE PATENTS INVALID.**

**A.      It Was Known in the Art to Track the Location of Pagers.**

The background of the '159 Patent refers to prior art paging systems that would continuously keep track of the current global location of pagers in order to efficiently route pages to the specific area where the pager is actually located, rather than "blindly" transmitting the page all over the world.  (SUF 2.)

**B.      It Was Obvious to Provide Privacy to Protect Subscribers.**

Enovsys, through its designee Mr. Fomukong, testified the need to add his "privacy feature" disclosed in the patents-in-suit was an obvious thing to do:

Q:      So what made you think about adding privacy?

A:      As I say, was something I discussed with Denzil.  I mean <u>it's just an obvious feeling [sic] (should be thing).</u>  If you have a phone, I can get you a

8

1      [your] location – if you have a phone that people can call in and get your

2      location, you don't want them to be able to do that all the time, so <u>you have</u>

3      <u>to have some kind of built-in-security</u>.

4 (SUF 3.)

5      **C.**    **It Was Known for Telephone Networks to Provide Privacy and**

6                 **Access Controls to Subscriber Services.**

7      In 1995, Mr. Fomukong filed an Invention Disclosure with the United States

8 Patent and Trademark Office. (SUF 4.) In this disclosure, Mr. Fomukong

9 acknowledged telephone companies had the facilities in place to allow customers to

10 block access to specific network services based on number being called. (SUF 5.)

11 Fomukong's disclosure stated "With these services, <u>a customer could block outgoing</u>

12 <u>calls</u> to certain areas from their line. Some services have gone further by offering a

13 plan whereby <u>upon entering a password the call blocking feature is overridden</u> and a

14 destination number that is usually blocked is transmitted." (*Id.*)

15      Such screening techniques were actually in place as early as the late 1980s.

16 For example:

17      Screening algorithms can develop screening tables to accommodate

18      individual subscribers. **Subscribers can override any entry** in the table

19      using a DTMF telephone to enter a personal identification number to

20      complete a call. <u>By comparing the PIN with the ANI</u> [Automatic Number

21      Identification] sent by the end office, <u>the service tandem will either **allow or**</u>

22      **<u>deny the override</u>**. Similarly, the subscriber also could access a screening

23      table to change selections on demand using a commercial credit card.

24 (SUF 6.)

25      **D.**    **A Person of Ordinary Skill in the Art Knew How to Change**

26                 **Passwords.**

27      Q:    Well, let's just make it easier.

28 */////*

9

1    Mr. Fomukong, it would be well within the skillset of a computer

2    programmer in 1995 to change a password at the network; don't you agree

3    with that?

4    . . . [Objection]

5    A:     I agree with that, sir. <u>Yeah, anybody can change a PIN code</u>.

6    (SUF 7.)

7    **E.     The Scope of the Claims Is Reduced to the Inventor's Claims**

8    **Regarding the Fundamental Difference Between Patents and Prior**

9    **Art.**

10   On multiple occasions, Mr. Fomukong has stated:

11   The fundamental difference between the invention and the prior art is the

12   way in which the invention limits a preauthorized network resource from

13   accessing the location of a mobile remote unit.  The prior art stops to provide

14   the location of the mobile remote unit to the network and the invention does

15   not.  <u>In the invention the location of the mobile is continuously provided to</u>

16   <u>the system or tracked during the time when a preauthorized network resource</u>

17   <u>is being denied access</u>.  Furthermore the prior art does not use the identity of

18   a preauthorized resource to deny access to location information.  (emphasis

19   added)

20   (SUF 8, 9.)

21   "It is, of course, well settled that an invention is construed not only in the

22   light of the claims, but also with reference to the file wrapper or prosecution history

23   in the Patent Office."  *Graham*, 383 U.S. at 33, 148 USPQ at 473.  Claims as

24   allowed must be read and interpreted with reference to rejected ones and to the state

25   of the prior art; and claims that have been narrowed in order to obtain the issuance of

26   a patent by distinguishing the prior art cannot be sustained to cover that which was

27   previously by limitation eliminated from the patent.  *Id.*

28   /////

10

When "the patentee obtained his patent only by accepting the limitations imposed by the Examiner" and "[t]he claims were carefully drafted to reflect these limitations," the patentee "is not now free to assert a broader view of [] [the] invention." *Id.* "The subject matter as a whole reduces, then, to the distinguishing features clearly incorporated into the claims." *Id.*

In this case, the Applicants amended the claims of what became the '461 patent during prosecution through a narrowing amendment. In particular, in a June 18, 2002 Office Action the Examiner rejected claims for obviousness in view of prior art. (SUF 87.) Fomukong responded by email (SUF 88) and then through various amendments to the claims (SUF 90-92). In these narrowing amendments asserted to overcome prior art, Fomukong amended the claims to incorporate the "continuously tracking" feature and by stating that the "continuously tracking" feature was the fundamental difference from the prior art. (SUF 93.) In response, the Examiner allowed the claims for the '461 patent. (SUF 94.) Therefore, under the governing Supreme Court authority, the claim scope of the '461 patent claims is limited by the "continuous tracking" feature.

As described in relation to Foladare, though, the technique of continuously tracking pagers in a paging system was established years before the filing of the patents-in-suit (SUF 58); similarly the use of the identity of a caller in determining whether the caller should be denied access to a mobile unit's location information was known years beforehand. Accordingly, under established Supreme Court law, the patents-in-suit are invalid as a matter of law.

## V.    SPECIFIC INVALIDATING PRIOR ART REFERENCES.

### A.    U.S. Patent No. 5,946,626 to Foladare et al. ("Foladare")–A Method and System for Determining Location of Subscriber of Two-Way Paging Service.

The Foladare patent – assigned to telephony pioneer AT&T – issued on August 31, 1999 from an application filed on December 26, 1995. (SUF 10-12.)

11

1  Foldadare is therefore prior art to the patents-in-suit under 35 U.S.C. § 102.

2        The Foladare invention describes an enhanced satellite paging system for

3  determining the location of a subscriber of a two-way paging service in order to

4  establish communications with the subscriber, to perform dependent-location calling

5  and other services.  (SUF 13, 15, 16.)  Figure 1 of the Foladare patent shows a block-

6  schematic diagram of the method and system of the Foladare invention.  (SUF 15.)

7  The Foladare invention describes "other" location based services that allowed

8  callers, such as "a wife, employer, probation officer or other individual . . . to know

9  the location of a spouse, employee, parolee or friend."  (SUF 14.)  As will be

10  discussed more fully below and illustrated in Exhibit 40 (*see* Decl. Erica J. Pascal in

11  Support of Nextel of California, Inc. et al.'s Motions for Summary Judgment ("Decl.

12  Pascal.") Ex. 40), Foladare describes many additional features and options for

13  configuring this location based service including privacy controls for restricting

14  callers' access to the location of the pager.

15        **1.      Foladare Discloses the "Distinguishing Features" of the**

16              **Patents-In-Suit.**

17        According to the law set forth by the Supreme Court in *Graham v. John*

18  *Deere*, the subject matter as a whole of the Patent-in-Suit is reduced to the two

19  distinguishing limitations Mr. Fomukong was forced to add to the claims:

20  "continuously tracking" and "use of the identity of a preauthorized resource to deny

21  access to the location information."  *Graham*, 383 U.S. at 33, 148 USPQ at 473.

22        Foladare describes both of these features.  First, Foladare describes

23  automatically tracking the location of pagers for purposes of establishing

24  communication and routing calls to pagers. (SUF 30-32.)  Second, Foladare

25  describes denying access to location information based on the identity of a

26  "preauthorized" resource.  (SUF 33.)  Because Foladare describes both of these

27  features, Foladare invalidates all claims in the patents-in-suit.  *Graham*, 383 U.S. at

28  33, 148 USPQ at 473.

1
             **a.**       **Foladare Discloses "*Continuous Tracking" When a***

2
                       ***"Preauthorized" Network Resource Is Being Denied***

3
                       ***Access*.**

4
According to Enovsys:

5
> The term "continuously being tracked," as used in this context [claim 23],

6
> refers to the system allowing the location of the mobile remote unit to be

7
> tracked (kept track of, provided, or accessed) without interruption.

8
(SUF 36, 37.)

9
Enovsys provides the following example of what it alleges satisfies this

10
"distinguishing feature":

11
> [D]uring such time (*i.e.,* the time that one or more preauthorized sources is

12
> being denied access to the location of a mobile device), the user's mobile

13
> device continues to communicate with the Sprint system over the control

14
> channel(s), which is used to locate and track the device within the network so

15
> that calls and data may be routed and transmitted to the user at the

16
> appropriate cell.

17
(SUF 38.)

18
Foladare describes a paging system that continuously tracks the location of

19
the pager. (SUF 18, 19.) To enable this feature "[t]he pager can include processing

20
hardware and software that automatically sends a signal back to the paging service

21
that updates the database." (SUF 20.) The paging network can also send a signal to

22
the pager, directing the pager to send periodic updates or to only send updates when

23
a caller calls seeking the subscriber's location. (SUF 39.) One of the purposes for

24
continuously tracking the pager's location is because the paging system uses this

25
location when routing calls and establishing communication with the pager.

26
(SUF 34, 35.)

27
/////

28
/////

13

1             **b.**     **Under the Holding in *Graham v. John Deere*, Foladare**

2                         **Invalidates the Patents-in-Suit.**

3      Because Foladare describes both "distinguishing features," which

4  Mr. Fomukong was forced to incorporated into the claims of the Patents-in-Suit,

5  Foladare invalidates all claims in the Patents-in-Suit.  *Graham*, 383 U.S. at 33, 148

6  USPQ at 473.

7             **2.**     **Foladare Discloses All Claimed Limitations in the Patents-**

8                  **in-Suit.**

9      The above section demonstrates how Foladare invalidates the claims in the

10  patents-in-suit as based on the disclosure of "continuous tracking" and denying

11  access to location information based on the identity of the caller.  However, for the

12  sake of optional completeness, this section illustrates how Foladare additionally

13  describes the other claim elements, which were conceded as being prior art.

14  Amending a claim in an attempt to distinguish it from cited prior art is a concession

15  that the prior versions of the claims were nothing more than a recitation of what was

16  already known in the prior art.  *Graham*, 383 U.S. at 33, 148 USPQ at 473.

17            **a.**     **Foladare Describes "*a Satellite Paging***

18                  ***Communications System With Means to Locate the***

19                  ***Global Position [of a] Call Receiver Unit.***"

20      The Claims 1, 2, 23, 25, and 28 of the '461 Patent recite a communications

21  system, and Claim 1 of the '159 Patent recites a satellite communications system . . .

22  (SUF 105-109, 111.)

23      Enovsys has provided the following assertions in its infringement

24  contentions:

25      A "communication system" includes a system or network of resources that

26         allows users of the system (whether individuals or services) to communicate

27         and transmit information to each other or to the system itself.

28  (SUF 40.)

                                                                CASE NO.  CV 06-5306-RSWL (SHX)

1   A "satellite paging" communication system includes a communication
2   system that (a) employs the use of satellite resources and (b) includes the
3   transmission of paging messages (short text, numeric, alphanumeric or
4   similar electronic alerts notifying the recipient that the sender is attempting to
5   contact, converse with, or otherwise receive information from him or her
6   and/or specifying or identifying a means for responding).

7   (SUF 41.)

8   Enovsys provides the following example of what it alleges satisfies as the
9   "satellite paging communication system," which is a type of a "communication
10  system":

11  Cellular network and associated resources, including space satellites and
12  satellite receivers, cellular base stations (which include cell towers with radio
13  antennas and associated equipment), computing resources, gateways, and
14  mobile communication devices (the "Nextel System").

15  *"with means to locate the global position of a call receiver unit"*
16  The Nextel system includes various "means to locate" *i.e.,* resources for
17  determining or identifying the location of) "a call receiver unit" *(i.e.,* the
18  mobile devices of Nextel users): (i) space satellites and satellite receivers, (ii)
19  cell towers, and (iii) the mobile devices themselves (including their signal
20  receivers and/or GPS enabling components).

21  (SUF 42.)

22  The paging system in Foladare contains: space satellites, satellite paging
23  transceiver, and satellite ground stations (SUF 43); cell towers ((SUF 44); network
24  access switch (SUF 45); network access control point (SUF 46); communication
25  couplings (SUF 44); local office (SUF 48); database (SUF 49); originating access
26  switch (SUF 50); network control point (NCP) (SUF 51); common channel
27  interoffice signaling link (CCIS) (SUF 52); voice response unit (VRU) (SUF 53);
28  /////

15

among other devices.  Accordingly, Foladare discloses the claimed communications systems.  (*see also* Decl. Pascal Ex. 40.)

                   **b.**      **Foladare Discloses "*a Call Receiver With the Ability to Resolving Its Location and Establishing the Location Information at the Network," and "a Mobile Remote Unit," and "Mobile Remote Receiving Unit.*"**

According to Enovsys:

> The term "call receiver unit," as used in this context [Claim 1 of the '159 Patent], includes a mobile communication device that allows its user to receive calls, as well as messages, and other types of communications.

(SUF 54.)  "Mobile remote unit" and "mobile remote" mean "a small, portable device that is used to send or receive communication transmissions from a remote location."  (SUF 55)  ; "mobile remote receiving unit" means "a small, portable device that is used to receive communication transmissions from a remote location (SUF 56).

Foladare discloses a pager that is able to establish two-way communication (receive and transmit) with the paging system, including space satellites.  (SUF 57-59.)  The pager is further able to determine its location and then signals to the network with location parameters describing the pager's location.  (*Id.*)  In another embodiment, the pager is able to transmit location signals containing "identifying information, which can be used by the paging service to identify the transmitting pager."  (SUF 22.)  Accordingly, Foladare discloses the claimed call receiver and mobile remote units.  (*see also* Decl. Pascal Ex. 40.)

                   **c.**      **Foladare Discloses "a Mobile Unit Able That Is Able to Establish Its Location Information at the Network."**

Enovsys provides the following example of what it alleges satisfies this limitation:

/////

16

CASE NO.  CV 06-5306-RSWL (SHX)

1    [T]he Sprint mobile devices are "able to communicate with" the Sprint cell

2    towers and/or satellites (and satellite receivers) associated with the Sprint

3    system, which are "signal transmitting and receiving units," to fix (or

4    "establish") the geographical location of the device *(i.e.,* "mobile remote unit

5    location information") "at the network" *(i.e.,* in a manner that establishes the

6    location at the network level, or makes the location accessible to other

7    resources associated with the network).

8    (SUF 60.)

9    Foladare discloses: "[u]pon receiving the location signal from the pager, the

10   paging service relays the signal to the database where the location parameter is

11   extracted from the signal and stored" in the subscriber's Customer Routing Point

12   ("CRP") record.  (SUF 23, 24.)  This CRP record is then used by network resources

13   to route calls to the subscriber, as well as providing the location information to

14   approved callers.  (SUF 25-27.)  Accordingly, Foladare discloses this claim element.

15   (*see also* Decl. Pascal Ex. 40.)

16           **d.**      **Foladare Discloses "*a First Profile*" and "*a Second**

17                   **Profile*" and the "*Use [of] the Identity of a***

18                   **Preauthorized Resource to Deny Access to Location***

19                   **Information*."***

20   According to Enovsys: "profile" means "a set or collection of information,

21   attributes, or parameters relating to a particular person, device, application, or

22   subject."  (SUF 61.)

23   The term "location access field indicating whether said preauthorized

24   resource . . . should be allowed/disallowed to access the location

25   information," as used in this context, refers to a field or element in the profile

26   that indicates whether the preauthorized resource should be allowed or

27   denied access to information concerning the geographical location of the

28   mobile device.

17

1 | (SUF 112.)

2 | Foladare discloses a database associated with a Customer Routing Point

3 | (CRP) that contains subscriber records (a CRP record), which stores the location of

4 | the pager and is used for routing calls to the subscriber.  (SUF 62.)  While not

5 | required, Foladare also discloses the ability to restrict access to the location

6 | information stored in the CRP record.  (SUF 62.)

7 | In one embodiment, the CRP records contain a three field profile for each

8 | "authorized" caller, which includes 1) the phone number of the caller's telephone,

9 | 2) the personal telephone number (PTN) of for the subscriber, 3) and a personal

10 | identification number (PIN).  (SUF 63.)  When a caller places a call requesting the

11 | location for a subscriber, the paging system collects the number dialed by the caller,

12 | the ANI (automatic number identification ), which is the caller's telephone number,

13 | and a PIN entered by the caller (also called caller entered digits, or "CED").

14 | (SUF 64.)  Once the paging system collects this information a network control point

15 | (NCP) sends a query to a Customer Routing Point (CRP).

16 | In the query, the NCP sends the CED, the PTN, and the caller telephone

17 | number (Automatic Number Identification number, or "ANI"). Based on the

18 | ANI and/or CED, the CRP screens the call, deciding whether or not the caller

19 | is to receive the subscriber location information. If the caller is not to receive

20 | subscriber information, the CRP instructs the NCP to route the call to a

21 | switch where an announcement could be played.

22 | (SUF 65.)

23 | Accordingly, Foladare discloses the profile recited in the patents-in-suit.

24 | Specifically, the "personal identification" code (PIN) satisfies the identity of a

25 | preauthorized resource, the subscriber's telephone number satisfies the identity of

26 | the first communication resource, and the number of the caller's telephone (ANI)

27 | satisfies as the location access field.  The ANI is used to determine whether the

28 | subscriber's location should be denied to a caller.  (*See also* Decl. Pascal Ex. 40.)

18

1   For example, if the caller uses a phone with a telephone number different from what
2   is in the subscriber's profile, the paging system will deny the request-even if the
3   caller had been approved in advance (i.e. "preauthorized" according to Enovsys) and
4   had entered the correct PIN and subscriber telephone number.

5           **e.**     **Foladare Discloses Allowing Certain "Preauthorized"**
6                   **Resources Access to Location Information While**
7                   **Blocking Other "Preauthorized" Resources Access to**
8                   **This Information.**

9          According to Enovsys, "preauthorized" means "Authorized (*i.e.*, approved or
10  given permission) in advance."  (SUF 95.)  Enovsys provides the following
11  examples of what it alleges satisfies as being "preauthorized" in the context of the
12  claims:

13          • Internal network services and resources that utilize a subscribers'
14  location information for routing calls and messages.  (SUF 100.)

15          • External cellular networks and resources that utilize the
16  subscriber's location information to manage roaming services and call routing.
17  (SUF 97.)

18          • Emergency services, resources, and personnel, such as 911
19  operators, that are able to obtain the subscriber's location information.  Such
20  systems and services are "inherently" preauthorized.  (SUF 98, 99.)  .

21          • Third party software applications, services, servers, and systems
22  that have a business relationship with the telephone network, such that they are
23  able submit requests for a subscriber's location, regardless of whether or not
24  such requests will be fulfilled.  (SUF 100.)

25          • Applications and services that a subscriber has activated or
26  "opted-in" to receive.  (SUF 101.)

27  /////
28  /////

                                          

• Applications and services that a subscriber has previously activated or "opted-in" to receive but has since de-activated or "opted-out" of receiving.  (SUF 102.)

• The subscriber and the subscriber's cell phone. (SUF 103.)

• Individuals that the subscriber has provided a PIN code associated with the subscriber's account for requesting the subscriber's location from the network.  Such individuals are still "preauthorized" even after the subscriber changes the PIN code but does not provide the individual with the updated PIN. (SUF 104, 127.)

As described in the previous section, Foladare discloses an embodiment which uses three pieces of information stored in a profile in the subscriber's CRP record to determine whether the subscriber's location should be provided to a caller. Bases on the system described in Foladare, the following are examples when the paging system will block a caller's request:

1)      The PIN code entered by the caller did not match the profile PIN.  This could be because the caller forgot the number, the caller mistyped the number or the subscriber changed the PIN code.

2)      The number of the Caller's phone doesn't match the caller-id (ANI) phone number in the profile.  This could be because the caller is using a calling from a different phone than what was used to create the profile, the caller changed the phone's number, or the subscriber changed the number in the profile.

3)      The subscriber phone number dialed by the caller doesn't match the subscriber's number.  This could be because the caller mistyped the number, or the subscriber changed the pager's number.

4)      The caller's phone is not sent to the paging system.  This could be because the caller has selected anonymous calling.

5)      Another circumstance is if the caller had recently placed a request for the subscriber's location.  Instead of getting the subscriber's location, the caller will

20

1  be notified there has been no change since the last request.  This may be a

2  satisfactory response to a caller, but the request is still denied.

3      As described above, Foladare describes having the pager automatically

4  update the network with the pager's location.  Accordingly, none of the above

5  conditions for denying a request for the subscriber's location will prevent other

6  requests for this information from being fulfilled.  Additionally, the paging

7  network's call routing system is able to request the subscriber's location in order to

8  route calls to the pager. (SUF 66.)

9      Accordingly, Foladare discloses a system that allows certain "preauthorized"

10 resources access to location information while blocking other "preauthorized"

11 resources access to this information.  (*See also* Decl. Pascal Ex. 40.)

12     **B.    Foladare Suggests Alternative Design Based on Prior Art**

13          **Knowledge and Techniques.**

14     "While the best mode for carrying out the invention has been described in

15 detail, those familiar with the art to which the invention relates will recognize

16 various alternative designs and embodiments for practicing the invention as defined

17 by the following claims."  (SUF 67.)  Examples of prior art knowledge, skill, and

18 techniques for implementing such alternative designs and embodiments are

19 described in the following references:

20     •    U.S. Patent No. 5,731,785 to Lemelson et al. ("Lemelson")–System And

21 Method For Locating Objects Including An Inhibiting Feature (SUF 68);

22     •    ANI Is The Key To Unlock Advanced Network Services ("ANI")

23 (SUF 71);

24     •    U.S. Patent No. 5,408,528 To Carlson Et Al. ("Carlson")–Method And

25 Apparatus For Flexible And Optimal Telephone Call Acceptance And Routing

26 (SUF 69);

27 /////

28 /////

21

1    • U.S. Patent No. 5,388,147 To Grimes ("Grimes")–Cellular

2    Telecommunication Switching System For Providing Public Emergency Call

3    Location Information (SUF 72);

4    • U.S. Patent 6,151,505 To Larkins Et Al. ("Larkins")–System And

5    Method For Reporting The Location Of A Mobile Telecommunications Unit To An

6    Authorized Terminator Telecommunications Unit (SUF 73);

7    • U.S. Patent No. 5,625,668 To Loomis Et Al. ("Loomis")–Position

8    Reporting Cellular Telephone (SUF 74);

9    • U.S. Patent No. 5,835,907 To Newman ("Newman")–Emergency PCS

10    System For Identification And Notification Of A Subscriber's Location (SUF 75);

11    • U.S. Patent Application Publication 2006/0025158 to LeBlanc et al.

12    ("LeBlanc")–Locating A Mobile Station And Applications Therefor (SUF 76-77);

13    • ATIS – A Modular Approach ("ATIS") (SUF 78);

14    • An Advanced Driver Information System Concept And Its

15    Communications Considerations ("ADIS") (SUF 79);

16    • Survey Of Location Technologies To Support Mobile 9-1-1 ("Driscoll")

17    (SUF 80);

18    • In The Matter Of Revision Of The Commission's Rules To Ensure

19    Compatibility With Enhanced 911 Emergency Calling Systems ("FCC 911 Report,

20    1994") (SUF 81);

21    • In The Matter Of Revision Of The Commission's Rules To Ensure

22    Compatibility With Enhanced 911 Emergency Calling Systems ("FCC 911 Report,

23    1996") (SUF 82);

24    • Wireless Technologies And The National Information Infrastructure

25    ("Wireless Tech") (SUF 83).

26    /////

27    /////

28    /////

22

## VI.   THE CLAIMED SUBJECT MATTER IS A CHOICE FROM A FINITE NUMBER OF IDENTIFIED, PREDICTABLE SOLUTIONS TO A PROBLEM, WITH A REASONABLE EXPECTATION OF SUCCESS.

While Foladare discloses every element of every claim in the patents-in-suit, individual elements in the Foladare paging system could be substituted with other prior art devices and techniques without impinging upon the operation of the system. For example, any one of the call receivers disclosed in Lemelson, Grimes, Larkins, Loomis, Newman, LeBlanc, Driscoll, ATIS, ADIS, and Wireless Tech (SUF 113-114, 116-126) could be incorporated into Foladare's tracking system to increase the number of call receiver options for subscribers of the system and to attack new subscribers.

Additionally, the telecommunications systems, services, and infrastructure described in Lemelson, Grimes, Larkins, Loomis, LeBlanc, Driscoll, ATIS, ADIS, and Wireless Tech (SUF 113-114, 116-126) could be incorporated into the public switched telephone network (PSTN) along with the telecommunication system described in Foladare.  The Foladare system is, in fact, already connected to the PSTN as described and illustrated below:

The caller initiates an incoming call from a telephone 41 by dialing the subscriber's PTN. This incoming call is coupled to a first local office 42 in the caller's locality through a first telephone line 54 The first local office routes the call to an originating access switch 44 over a first trunk line 56. Switch 44 may take the form of a digital switch, or an electronic switching system, such as an AT&T 4ESS™ switch ("4E" switch) commonly known to those skilled in the art. (emphasis added).  (SUF 84.)

Furthermore, the call screening system disclosed in Foladare for controlling access to the subscriber's location could be modified as disclosed in Grimes to provide emergency services, such as 911, access to the subscriber's location information in an emergency.  (SUF 67, 114.)  Additionally, call screening

1   techniques described in ANI could be employed to provide additional override
2   features to some of the call screening settings (SUF 85.).

3        Also, the call screening profile described in Carlson (SUF 70) could be
4   applied to the call screening application disclosed in Foladare to provide additional
5   options to subscribers for establish a mix of privacy settings for different individuals,
6   "[f]or example, a wife, employer, probation officer or other individual may want to
7   know the location of" the subscriber.  (SUF 86.)  Carlson describes an exemplary
8   number list for determining how to route incoming calls. (e.g., location requests in
9   the Foladare system.)  (SUF 70.)

10       Many additional systems and techniques could also be employed with the
11  Foladare system.  However, the above references describe in much greater detail
12  each element of all claims in the patents-in-suit than the detailed descriptions for the
13  '159 Patent and '461 Patent do.

14  **VII.    THE CLAIMED SUBJECT MATTER IS AN APPLICATION OF A**
15  **KNOWN TECHNIQUE TO A KNOWN SYSTEM READY FOR**
16  **IMPROVEMENT TO YIELD PREDICTABLE RESULTS.**

17       As described in the previous section, Foladare and the systems and services
18  described in the above list of references are telecommunication applications that are
19  applied to the public switched telephone network (PSTN).  Each technique, system
20  and service described in these references were known prior art to the patents-in-suit
21  and their arrangement together would produce improvements to the PSTN with
22  predictable results, as described by the references themselves.

23  **VIII.   THE CLAIMED SUBJECT MATTER IS A PREDICTABLE**
24  **VARIATION OF A KNOWN WORK THAT WOULD HAVE BEEN**
25  **PROMOTED BASED UPON DESIGN INCENTIVES.**

26       As described above, adopting any one of the components, services, or
27  techniques described in the above list of prior art references to the Foladare system

28

24

1  would have been promoted based upon market forces and design incentives such as

2  consumer demand, cost, and availability, industry standards, and regulations.

3  (SUF 80-82.)  Each combination of these systems and techniques is a predictable

4  variation of a finite number of possible options, which was known to one of ordinary

5  skill in the art as evidenced in the disclosures themselves.

6  **IX.    CONCLUSION**

7       The Court should invalidate Claims 1-14 of the '159 Patent and Claims 1-28

8  of the '461 Patent because these claims do not satisfy the conditions of patentability

9  under 35 U.S.C. §§ 102 and 103.  Accordingly, Defendants request that this Court

10  enter summary judgment finding all claims of the '159 patent and the '461 Patent

11  invalid as a matter of law and dismiss this case with prejudice.

12  Dated:  December 28, 2007          DLA PIPER US LLP

13

14                              By:   /s/ Randall E. Kay
                                JOHN ALLCOCK (Bar No. 098895)
15                              RANDALL E. KAY (Bar No. 149369)
                                DLA PIPER US LLP
16                              401 B Street, Suite 1700
                                San Diego, CA  92101-4297
17                              Tel:  619.699.2800
                                Fax:  619.699.2701
18                              john.allcock@dlapiper.com
                                randy.kay@dlapiper.com
19
                                RAYMOND W. MORT III
20                              (admitted pro hac vice, TX Bar No.
                                00791308)
21                              DLA PIPER US LLP
                                1221 South MoPac Expressway, Suite 400
22                              Austin, TX 78746
                                Tel:  (512) 457-7234
23                              Fax:  (512) 457-7001
                                raymond.mort@dlapiper.com
24
                                Attorneys for Defendants/Counterclaimants
25                              NEXTEL COMMUNICATIONS, INC., et al.

26

27

28

25